In re Pozen S'holders Litig., 2005 NCBC 7

| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE SUPERIOR COURT DIVISION |
|---|---|
| COUNTY OF ORANGE | |

| In re Pozen Shareholders Litigation | Consolidated Civil Action No. 04 CVS 1540 (Consolidated with 04 CVS 1542) |
|---|---|

## ORDER AND OPINION

{1}     This case arises out of Plaintiffs Philip Stein and Michael Rosenstock's ("Plaintiffs") shareholder derivative claims on behalf of Pozen, Inc. ("Pozen") against Defendants John R. Plachetka, Kristina M. Adomonis, John E. Barnhardt, Matthew E. Czajkowski, Andrew L. Finn, Peter J. Wise, Paul L. Rizzo, Ted G. Wood, Kenneth B. Lee, Jr., Jacques F. Rejeange, Bruce A. Tomason, and James R. Butler, in their capacities as officers and/or members of Pozen's Board of Directors. Specifically, plaintiffs assert claims for insider selling and misappropriation of information, breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment. Pozen is named as a nominal defendant. This matter comes before the Court on defendants' motion to dismiss.

{2}     After considering briefs and oral arguments, the Court GRANTS defendants' motion to dismiss on the grounds that the Amended Complaint does not establish demand futility under Delaware law.

*Garlitz & Williamson, PLLC by F. Lane Williamson; Robbins Umeda & Fink, LLP by Brian J. Robbins, Jeffrey P. Fink, and Steven R. Wedeking; Faruqi & Faruqi, LLP by David H. Leventhal, Nadeem Faruqi, Adam Gonnelli, and Beth A. Keller for Plaintiffs Philip Stein and Michael Rosenstock.*

*Womble Carlyle Sandridge & Rice, PLLC by Pressly M. Millen; Morgan Lewis & Bockius, LLP by William P. Quinn, Jr., Karen Pieslak Pohlmann, and David W. Marston, Jr., for Defendants John R. Plachetka, Kristina M. Adomonis, John E. Barnhardt, Matthew E. Czajkowski, Andrew L. Finn, Peter J. Wise, Paul L. Rizzo, Ted G. Wood, Kenneth B. Lee, Jr., Jacques F. Rejeange, Bruce A. Tomason, and James R. Butler.*

## I.
## PROCEDURAL BACKGROUND

{3}     These two shareholder derivative actions were filed in Orange County Superior Court. The cases were designated complex business cases and assigned to the undersigned Special Superior Court Judge for Complex Business Cases by order of the Chief Justice of the Supreme Court of North Carolina dated December 14, 2004. The two cases were consolidated with consent of all parties on April 25, 2005. Plaintiffs' Consolidated Shareholder Derivative Complaint ("Amended Complaint") was filed on March 31, 2005.

{4}     Several related class actions have been filed in the Middle District of North Carolina against

Pozen, Inc. and Dr. John R. Plachetka, its Chief Executive Officer, alleging violations of the Securities Exchange Act of 1934. Those actions remain pending. *See In re Pozen Sec. Litig.*, 386 F. Supp. 2d 641 (M.D.N.C. 2005) (denying defendants' motion to dismiss).

II.

FACTUAL BACKGROUND

A.

THE PARTIES

{5} Plaintiff Philip Stein is, and at all relevant times has been, a common stock shareholder of Pozen. Plaintiff Michael Rosenstock is, and at all relevant times has been, a common stock shareholder of Pozen.

{6} Nominal Defendant Pozen is a corporation organized and existing under the laws of the state of Delaware, with its headquarters located in Chapel Hill, Orange County, North Carolina. Pozen is a pharmaceutical company which has specialized in the development of a portfolio of drugs for the global migraine market.

{7} Defendant John R. Plachetka ("Plachetka") is, and at all relevant times has been, President and Chief Executive Officer of Pozen. Platchetka is a member of the Board of Directors of Pozen. Platchetka has served as Chairman of the Board of Directors since January 2001.

{8} Defendant Kristina M. Adomonis ("Adomonis") is, and at all relevant times has been, Senior Vice President, Business Development of Pozen.

{9} Defendant John E. Barnhardt ("Barnhardt") is, and at all relevant times has been, Vice President, Finance and Administration of Pozen. Barnhardt was the Interim Chief Financial Officer of Pozen from January 2004 until August 2004.

{10} Defendant Matthew E. Czajkowski ("Czajkowski") was the Chief Financial Officer and Senior Vice President, Finance and Administration of Pozen at all relevant times until January 2004.

{11} Defendant Andrew L. Finn ("Finn") was the Executive Vice President, Product and Development of Pozen at all relevant times until March 27, 2003.

{12} Defendant Peter J. Wise ("Wise") is, and at all relevant times has been, a member of the Board of Directors of Pozen. Wise has served as Vice Chairman of the Board of Directors since January 2001.

{13} Defendant Bruce A. Tomason ("Tomason") is, and at all relevant times has been, a member of the Board of Directors of Pozen.

{14} Defendant Ted G. Wood ("Wood") is, and at all relevant times has been, a member of the Board of Directors of Pozen.

{15} Defendant Paul J. Rizzo ("Rizzo") is, and at all relevant times has been, a member of the Board of Directors of Pozen.

{16} Defendant Kenneth B. Lee ("Lee") is, and at all relevant times since December 2002 has been, a member of the Board of Directors of Pozen.

{17} Defendant James R. Butler ("Butler") is, and at all relevant times since July 2003 has been, a member of the Board of Directors of Pozen.

{18} Defendant Jacques F. Rejeange ("Rejeange") is, and at all relevant times since January 2004 has been, a member of the Board of Directors of Pozen.

{19} The Pozen Board of Directors thus consisted of one insider—Plachetka—and seven outside directors—Wise, Finn, Thomason, Wood, Rizzo, Lee, Butler, and Rejeange. None of the outside directors are accused of insider trading nor are any false or misleading statements directly attributed to them.

B.

## OVERVIEW OF THE FACTS

{20} Plaintiffs allege the following facts which, for the purposes of this motion to dismiss, will be treated as true. Generally stated, plaintiffs complain of insider trading on the part of several of Pozen's officers and of statements made by Plachetka which misled the investment community as to what clinical studies revealed about the safety and efficacy of two drugs being developed by Pozen and their chances of gaining FDA approval.

{21} During the period throughout which the alleged wrongdoing occurred, Pozen's lead products were MT 100 and MT 300. MT 100 was a "proprietary formulation containing metoclopramide hydrochloride and naproxen sodium" which was designed "to enhance the effectiveness and duration of migraine symptom relief provided by both drugs, with fewer adverse side effects than other migraine therapies." (Consol. S'holder Derivative Compl. ¶¶ 4-5.) MT 300, a "pre-filled syringe containing dihydroergotamine mesylate, or DHE," was designed "to provide long-lasting pain relief for patients via a convenient injectable therapy for severe migraine attacks." (Consol. S'holder Derivative Compl. ¶¶ 4 & 6.)

{22} Pozen submitted a New Drug Application ("NDA") to the U.S. Food and Drug Administration ("FDA") for MT 300 in December 2002. In July 2003, Pozen submitted an NDA for MT 100, which was completed in January 2004. (Consol. S'holder Derivative Compl. ¶¶ 6-7.)

{23} The NDAs for both MT 100 and MT 300 were ultimately rejected by the FDA, and the rejection letters were disclosed to the public on June 1, 2004, and October 20, 2003, respectively, resulting in significant losses to the value of Pozen stock. (Consol. S'holder Derivative Compl. ¶¶ 10-11.)

{24} Plaintiffs allege that, prior to the rejections, defendants "artificially inflated the prices of Pozen securities by concealing critical material information regarding the details of both the safety and efficacy of MT 100 and MT 300." More specifically, they claim that "[d]efendants concealed key adverse information regarding known adverse effects and safety issues, as well as the design, execution and interpretation of studies necessary to satisfactorily assess safety and efficacy." (Consol. S'holder Derivative Compl. ¶ 9.)

{25} As a result of the concealment, plaintiffs allege Pozen securities traded at artificially inflated prices which ultimately caused millions of dollars in damage to the company. (Consol. S'holder Derivative Compl. ¶ 13.)

C.

## INSIDER TRADING

{26} Plaintiffs' Amended Complaint focuses primarily on alleged insider trading by several of Pozen's officers, only one of whom, Plachetka, is a member of the Board of Directors. Specifically, four of Pozen's officers—Plachetka, Adomonis, Barnhardt, and Czajkowski—are alleged to have sold shares of Pozen stock while in possession of undisclosed material adverse information. (Consol. S'holder Derivative Compl. ¶¶ 17-20, 153, 159-63.)

{27} Plaintiffs allege that Defendant Plachetka was granted 668,750 options to purchase Pozen stock during the relevant period and that he sold 250,000 shares for proceeds of $4,250,000. (Consol. S'holder Derivative Compl. ¶ 17.) Plaintiffs give no indication of what percentage of Plachetka's total ownership of Pozen stock the 250,000 shares constituted. The Amended Complaint does not specifically state what adverse non-public information Plachetka possessed at the time of sale. Plaintiffs simply claim that

"[b]ecause of his position" in the company—as President, Chief Executive Officer, and Chairman of the Board of Directors—Plachetka:

> knew of adverse non-public information about the business of Pozen, as well as finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to him in connection therewith.

(Consol. S'holder Derivative Compl. ¶ 17.)

{28}     Plaintiffs allege that Defendant Adomonis was granted 131,250 options to purchase Pozen stock during the relevant period and that she sold 69,925 shares for proceeds of $947,162. (Consol. Derivative Compl. ¶ 18.) Plaintiffs give no indication of what percentage of Adomonis' total ownership of Pozen stock the 69,925 shares constituted. The Amended Complaint does not specifically state what adverse non-public information Adomonis possessed at the time of sale. Plaintiffs simply claim that "[b]ecause of her position" in the company, Adomonis:

> knew the adverse non-public information about the business of Pozen, as well as finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to her in connection therewith.

(Consol. S'holder Derivative Compl. ¶ 18.)

{29}     Plaintiffs allege that Defendant Barnhardt was granted 92,450 options to purchase Pozen stock during the relevant period and that he sold 77,148 shares for proceeds of $1,109,134. (Consol. Derivative Compl. ¶ 19.) Plaintiffs give no indication of what percentage of Barnhardt's total ownership of Pozen stock the 77,148 shares constituted. Plaintiffs simply claim that "[b]ecause of his position" in the company, Barnhardt:

> knew the adverse non-public information about the business of Pozen, as well as finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.

(Consol. S'holder Derivative Compl. ¶ 19.)

{30}     Plaintiffs allege that Defendant Czajkowski was granted 187,500 options to purchase Pozen stock during the relevant period and that he sold 25,000 shares for proceeds of $425,000. (Consol. Derivative Compl. ¶ 19.) Plaintiffs give no indication of what percentage of Czajkowski's total ownership of Pozen stock the 25,000 shares constituted. The Amended Complaint does not specifically state what adverse non-public information Czajkowski possessed at the time of sale. Plaintiffs simply claim that "[b]ecause of his position" in the company, Czajkowski:

> knew of adverse non-public information about the business of Pozen, as well as finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.

(Consol. S'holder Derivative Compl. ¶ 20.)

{31}     Plaintiffs do not indicate what non-disclosed material information any of these directors possessed

at the time of any of these sales. Nowhere in the Amended Complaint do plaintiffs allege the existence of any specific knowledge on the part of any of these defendants at the time of any specific sale; nor do plaintiffs point to any specific sources of such information. The extent of plaintiffs' allegations of insider trading is that four of Pozen's officers owned and sold stock during a three-year period and that because of their positions in the company they must have known some adverse non-public information at some unstated time during the same period.

D.

THE MISSTATEMENTS

{32} In addition to allegations of insider trading by Pozen officers, the Amended Complaint asserts a failure of the Board of Directors to properly supervise the conduct of and statements made by company officers during the period between October 10, 2000, and December 2004. While the Amended Complaint attempts to attribute the statements to individual outside directors, it fails to do so adequately. Rather, all the direct quotations are from officers, specifically Plachetka.

{33} The Amended Complaint recites a 45-page long string of allegedly improper statements made by Pozen officers relating to the development of MT 100 and MT 300. (Consol. S'holder Derivative Compl. ¶¶ 59-151.)

{34} Plaintiffs allege that the first of these statements occurred on October 10, 2000, when the company filed an SEC Form S-1/A in connection with its Initial Public Offering. (Consol. S'holder Derivative Compl. ¶ 59.) There, the company described the benefits of MT 100. Plaintiffs claim that the form was misleading because it failed to note that an ingredient in MT 100 was "known to stimulate lactation and the production of breast milk." (Consol. S'holder Derivative Conpl. ¶¶ 59-61.) Plaintiffs allege that the misstatements were intended to conceal concerns about a possible link between drugs capable of stimulating prolactin production and breast cancer. (Consol. S'holder Derivative Compl. ¶ 62.) Furthermore, plaintiffs allege that the company misled investors by stating that it had entered into an agreement with the FDA "to deviate from the requirement of two successful clinical trials to demonstrate that the product candidate meets with standards for approval." (Consol. S'holder Derivative Compl. ¶ 65.)

{35} According to the Amended Complaint, between January 26, 2001, and February 18, 2004, the company issued some 25 press releases regarding the development of MT 100 and MT 300 and its ongoing efforts to gain FDA approval. (Consol. S'holder Derivative Compl. ¶¶ 59-151.) None of these press releases are alleged to have been authored by any particular person—in each instance, the Amended Complaint only generally states that the defendants collectively caused the company to issue them. (Consol. S'holder Derivative Compl. ¶¶ 59-151.) Plaintiffs allege that these press releases demonstrate a continued effort by the company to conceal concerns about the efficacy of the two drugs as well as safety issues, such as the possible connection to breast cancer. (Consol. S'holder Derivative Compl. ¶¶ 59-151.) The Amended Complaint contends that these statements were designed to mislead the market and conceal "the fraudulent and defective nature of the NDA filings." (Consol. S'holder Derivative Compl. ¶ 111.)

{36} In addition to press releases, the Amended Complaint includes excerpts from five conference calls at which Defendant Plachetka made allegedly misleading statements regarding the safety and efficacy of MT 100 and MT 300. (Consol. S'holder Derivative Compl. ¶¶ 59-151.)

E.

ALLEGED WRONGDOING

BY THE INDIVIDUAL DEFENDANTS

{37}    In addition to claims of alleged insider trading by Pozen's officers, plaintiffs contend that by concealing information relating to the safety and efficacy of MT 100 and MT 300, defendants breached their fiduciary duties of good faith, fair dealing, loyalty, and due care; grossly mismanaged and abused their ability to control the corporation; wasted corporate assets; and were unjustly enriched.  For the most part the only wrongful actions tied to any specific defendant relate to the alleged incidents of insider trading.  In fact, with the exception of Defendant Plachetka, plaintiffs do not allege any wrongful action on the part of any specific member of Pozen's Board of Directors.

{38}    Other than a single incident of insider trading, the extent of plaintiffs' specific factual allegations as to Defendant Plachetka is that he concealed material non-public information regarding MT 100 and MT 300 in various press releases and conference calls.  However, the complaint fails to identify how or when Mr. Plachetka came to know such non-public information.  Plaintiffs merely assert that Plachetka must have known this information due to his position in the company, access to corporate documents, and attendance at various meetings.  (Consol. S'holder Derivative Compl. ¶ 17.)

{39}    At no point in the complaint do plaintiffs allege any specific wrongful action undertaken by the Board acting as a whole.

III.

MOTION TO DISMISS

{40}    This matter comes before the Court on the defendants' motion to dismiss.  Defendants base their motion to dismiss on two separate grounds.  First, defendants argue that dismissal is warranted because plaintiffs failed to make a pre-suit demand on Pozen's Board of Directors, as required by Delaware law, and have not demonstrated in the alternative that such demand should be excused.  Second, defendants assert that plaintiffs' claims are deficient as a matter of law.  The Court concludes that plaintiffs' claims should be dismissed because no demand was made. Consequently, there is no need to reach defendants' arguments that plaintiffs' claims are legally deficient.

A.

THE DEMAND REQUIREMENT

{41}    Defendants' motion to dismiss is based primarily on plaintiffs' failure to make a pre-suit demand on the corporation.  Plaintiffs argue that demand should be excused under Delaware law because such demand would have been futile.  Because Pozen is a Delaware corporation, the issue of whether demand should be excused here is properly governed by Delaware law.  N.C. Gen. Stat. § 55-7-47 (2004); *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95-96 (1991).

{42}    The derivative suit "permits an individual shareholder to bring a suit 'to enforce a *corporate* cause of action against officers, directors, and third parties.'"  *Kamen,* 500 U.S. at 95 (quoting *Ross v. Bernhard*, 396 U.S. 531, 534 (1970)).   In order to deter abuse, states universally require shareholders to exhaust all intracorporate remedies before taking advantage of the derivative action and show that "the corporation itself had refused to proceed after suitable demand."  *Ross,* 396 U.S. at 534; s*ee Kamen*, 500 U.S. at 102 n.7 (citing D. DeMott, Shareholder Derivative Actions § 5:03, p. 23 (1987)).

{43}    The demand requirement is premised on the idea that the decision of whether to bring a lawsuit is a business one that is properly in the hands of the corporation's directors, whose role it is to manage the business and affairs of the corporation.  *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984).   Its purpose is

to ensure that the derivative action remains an exception to the general rule that the appropriate party to bring suit is the corporation acting through its directors. *Id.* at 811-12. Therefore, under Delaware law, "the right of a stockholder to bring a derivative action does not come into being until he has made a demand on the corporation to institute such an action, that such a demand has been refused, or until the plaintiff stockholder has demonstrated that such a demand would have been futile." *Stepak v. Dean*, 434 A.2d 388, 390 (Del. Ch. 1981).

{44}     Plaintiffs here concede that they filed suit without first making demand on Pozen's Board of Directors. They instead argue that demand would have been futile and that therefore their failure to make such demand should be excused.

B.

DEMAND FUTILITY

{45}     To survive a motion to dismiss in a case where demand is not first made on the corporation, a plaintiff must plead facts *with particularity* that demonstrate the reasons why demand would have been futile. *Aronson*, 473 A.2d at 815; *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000). The "pleadings must comply with stringent requirements of factual particularity that differ substantially from [traditional pleading requirements. The demand requirement] is not satisfied by conclusory statements or mere notice pleading. . . . What the pleader must set forth are particularized factual statements that are essential to the claim." *Brehm*, 746 A.2d at 254; *accord Grabow v. Perot*, 539 A.2d 180, 187 (Del. 1988) ("[O]nly well-pleaded allegations of fact will be accepted as true; conclusory allegations of fact or law not supported by allegations of specific fact may not be taken as true.").

{46}     Under Delaware law, if a plaintiff fails to satisfy this heavy burden, his complaint must be dismissed, irrespective of the strength of his claim on the merits. *Brehm*, 746 A.2d at 249. In considering whether the plaintiff has adequately demonstrated demand futility, courts consider only the particularized factual allegations made in the complaint. *Spiegel v. Buntrock*, 571 A.2d 767, 774 (Del. 1990).

{47}     Delaware courts have established two inquiries for evaluating demand futility. The two tests are similar and overlapping, and the determination of which test applies depends on whether or not the plaintiff challenges a specific action on the part of the board of directors.

{48}     Where the complaint challenges a specific action of the board of direcors, Delaware courts apply the two-prong test set forth in *Aronson v. Lewis.* The *Aronson* test states:

> [I]n determining demand futility the [trial court] in the proper exercise of its discretion must decide whether under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.

*Aronson*, 473 A.2d at 814. While this two-prong test as initially declared in *Aronson* is stated in the conjunctive, later decisions have articulated that the test should be applied in the disjunctive. *See Brehm*, 746 A.2d at 256. As a consequence, under the *Aronson* test, a plaintiff need only raise a reasonable doubt that either: (1) a majority of the directors is incapable of acting in a disinterested and independent manner or (2) the transaction was not a result of a valid exercise of business judgment.

{49}     Where no specific action undertaken by the board as a whole is challenged, however, Delaware courts apply the test articulated in *Rales v. Blasband.* 634 A.2d 927 (Del. 1993). Under the *Rales* test, the court must determine "whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its *independent and disinterested business judgment* in responding to the

demand." *Rales*, 634 A.2d at 934 (emphasis added). In essence and in operation, the *Rales* test is merely the first part of the Aronson test—the "interestedness and independence" prong. *See Rattner v. Bidzos*, 2003 WL 22284323, at *8 (Del. Ch. Oct. 7, 2003) (noting that the focus of the *Rales* inquiry "is upon the *disinterestedness and the independence* of a majority of the board of directors in responding to a demand") (emphasis added).

{50}    Plaintiffs here do not complain of any specific transaction undertaken by the Board of Directors as a whole, nor do they allege that the defendants had an affirmative duty to act in some specific way and consciously disregarded that duty. Rather, plaintiffs complain in very general terms of the Board's ongoing passivity in managing the affairs of the company—particularly in its supervision of statements made by Pozen's officers relating to the development of MT 300 and MT 100.

{51}    Therefore, this Court applies the singular inquiry set forth in *Rales*, asking whether the plaintiffs have asserted particularized facts sufficient to raise a reasonable doubt that a majority of Pozen's Board of Directors could have responded in an independent and disinterested manner had demand been made. Under this inquiry, the Court asks whether any of the directors were rendered "interested" by any of the conduct alleged and, if so, whether the disinterested directors were nonetheless capable of acting independently from those interested directors. In conducting this analysis, the Court considers those directors who were on the Board at the time the original Complaint was filed. *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984).

1.

DIRECTORIAL INTEREST

{52}    The Court first turns to the alleged interestedness of the director defendants. To establish directorial interest, a plaintiff must plead particularized facts demonstrating either a financial interest or entrenchment on the part of the allegedly interested directors. *Grabow v. Perot*, 539 A.2d 180, 188 (Del. 1988).

{53}    Most of plaintiffs' grounds for excusal assert a financial interest on the part of one or more of Pozen's directors. A director is financially interested where "he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." *Rales*, 634 A.2d at 936 (citing *Aronson*, 473 A.2d at 812; *Pogostin*, 480 A.2d at 624). A director is also deemed interested where a decision of the board "will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Rales*, 634 A.2d at 936. All of this boils down to a question of whether the decision to bring suit would have material consequences for the director himself that differ from those that would fall on the corporation. For his failure to make demand to be excused, a plaintiff must demonstrate that a majority of the directors have a direct and material interest in the transaction or the conduct alleged. *Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002).

{54}    At the time the original Complaint was filed, Pozen's Board was composed of eight directors: John R. Plachetka, Peter J. Wise, Bruce A. Tomason, Ted G. Wood, Paul J. Rizzo, Kenneth B. Lee, Jr., James R. Butler, and Jacques F. Rejeange. Seven of the eight directors whose independence is challenged are outsiders. For purposes of this opinion, the Court considers Mr. Plachetka to be an interested director and focuses on the seven outside directors. The plaintiffs argue in their complaint that one or more of these outside directors is financially interested for the following reasons:

1.    Defendant Plachetka himself engaged in alleged illegal insider trading while in possession of material, non-public information (Consol. S'holder Derivative Compl. ¶157(a));

2. Four of the directors, Defendants Tomason, Wood, Lee, and Rizzo, were members of the Board's Audit Committee, which recommended that the Board include improperly audited consolidated financial statements in various filings with the SEC (Consol. S'holder Derivative Compl. ¶157(d));

3. The entire Board participated in, approved, or permitted the wrongs alleged; participated in efforts to conceal or disguise them; and/or benefited directly from those wrongs (Consol. S'holder Derivative Compl. ¶¶ 157(e), (i), (j), (l) & (m));

4. In order to bring suit, the directors would be forced to sue themselves (Consol. S'holder Derivative Compl. ¶ 157(k));

5. Any suit brought by the directors on behalf of Pozen would expose those directors to liability elsewhere (Consol. S'holder Derivative Compl. ¶¶ 157(n) & (p)); and

6. The company's liability insurance policy does not cover suits brought by the company against the directors directly. Therefore, if the directors were to authorize suit, they would open themselves up to uninsured liability. (Consol. S'holder Derivative Compl. ¶ 157(q).)

These arguments are considered in turn.

{55} First, plaintiffs base their charge of directorial interest on incidents of alleged illegal insider trading by Defendant Plachetka. As noted above, for the purposes of this opinion, Mr. Plachetka is considered interested. As the insider trading argument only applies to Plachetka, the Court need not address this ground for demand excusal.[1]

{56} Second, plaintiffs allege that four of the eight defendants were interested in light of their position on the Board's Audit Committee. The primary thrust behind the strict demand excusal test set forth in *Rales* and *Aronson* is a pointed rejection of the idea that directors are biased per se merely on account of their position in a company's corporate governance structure. *See Aronson*, 473 A.2d at 815 n.8. Any assertion that a director is interested on account of his status within the corporation's corporate structure must be supported by particularized facts which would allow the court to conclude that that particular board is structurally biased. *Id.*

{57} Here, plaintiffs complain of self-interest on the part of the four members of the Audit Committee. Plaintiffs point to the fact that the committee "is responsible for oversight of the financial reporting process and system of internal control over financial reporting, and selects and oversees the performance of, and approves in advance the services provided by, Pozen's independent public accountants." (Consol. S'holder Derivative Compl. ¶ 157(d).) However, the plaintiffs fail to tie these duties, or any failure to uphold them, to any of the misconduct which is the basis of plaintiffs' complaint.

{58} The crux of the plaintiffs' complaint is that the company misinformed its shareholders as to the safety and efficacy of MT 100 and MT 300.[2] Plaintiffs do not complain of any misconduct relating to the supervision of any of Pozen's financial statements or internal financial controls, nor do they explain how certain directors' status as members of the Audit Committee should enable or require them to evaluate the accuracy of statements regarding the safety and efficacy of MT 100 or MT 300.

{59} The problem with plaintiffs' attack on the disinterestedness of a majority of the directors here is that the practical effect of the ruling they seek would make it impossible to find a disinterested and

independent board anywhere. Plaintiffs would have the Court rule that the members of the Audit Committee cannot be independent and disinterested simply because they were members of the Audit Committee. Audit committees of publicly traded companies are required to have independent and disinterested directors comprise the committee. It makes no sense to require audit committees to be made up of independent and disinterested directors and then find them not to be independent and disinterested because they are on the audit committee. Similarly, it makes no sense to hold that other independent directors are not independent because their compensation or nomination is dependent on the action of other directors on an audit, compensation, or nominating committee—committees generally populated by independent directors. The Amended Complaint is devoid of any specific pleading that the members of the Audit Committee had any oversight of the public statements made by management to analysts. They did not give their prior approval, nor were they present when the statements were made, and the statements made by management were in the normal course of management's responsibility. Plaintiffs' allegations as to the interestedness of these four directors on account of their membership on the Audit Committee are merely conclusory and are insufficient to allow this Court to find that demand is excused here.

{60}    Third, plaintiffs assert that the entire board lacks disinterest because as a whole it participated in, approved, or concealed the wrongs alleged and/or benefited directly from those wrongs. Delaware courts have consistently held, however, that blanket allegations that the directors participated in or approved the alleged misconduct are insufficient to establish interest. *See, e.g., Rales*, 634 A.2d at 936; *Kaufman v. Belmont*, 479 A.2d 282, 288 (Del. Ch. 1984) ("[M]ere approval of a corporate action . . . will not disqualify the director from subsequently considering a pre-suit demand to rectify the challenged transaction."); *Haber v. Bell*, 465 A.2d 353, 359 (Del. Ch. 1983) ("[A]llegations that the members of the Board of Directors 'approved or acquiesced in' the actions which plaintiffs attack are . . . not sufficient to excuse demand for redress before suit."); *Decker v. Clausen*, 1989 Del. Ch. LEXIS 143, at *7-8 (Del. Ch. Sept. 8, 1989) (noting that allegations that directors participated in or approved the alleged wrongs as a showing of directorial interest "have been rejected consistently by [Delaware] courts").

{61}    Clearly, the directors are not required to ensure that a pharmaceutical company with NDA filings pending publicly speculate as to all the possible problems the FDA might find in its NDA. Just as clearly, directors who are aware that management's public statements are false should take action. It is easy to look back with 20-20 hindsight after an NDA is rejected and say the directors should have known that the NDA would be rejected and why. Investors in pharmaceutical companies, especially those engaged in research and development, should know that FDA approval is not easy to obtain and that there are often setbacks and rejections in the application process as well as clinical failures. Only by going through the NDA process can a drug company know specifically the concerns the FDA has concerning a particular drug application. The directors are not required to have the same level of scientific knowledge attributable to management; nor are directors responsible for the management of the application process. That job belongs to management. Absent specific knowledge to the contrary, the board of directors of a pharmaceutical company may rely upon management's assessment of the safety and efficacy of the company's products and its assessment of progress in the FDA approval process. The directors' responsibility is to have programs in place designed to detect or discover the falsification of information provided to the FDA and the public or the suppression of information which should be provided to the FDA by FDA guidelines. In that regard, the guidance provided by Chancellor Allen in *In re Caremark Deriv. Litig.* is instructive:

> [N]o rationally designed information and reporting system will remove the possibility that the corporation will violate laws or regulations, or that senior officers or directors may nevertheless sometimes be misled or otherwise fail reasonably to detect acts material to the corporation's compliance with the law. But it is important that the board exercise a good faith judgment that the corporation's information will come to its attention in a timely manner as a matter of ordinary operations, so that it may satisfy its responsibility. Thus, I am of the view that a director's obligation includes a duty to attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists, and that failure to do so under some circumstances may, in theory at least, render a director liable for losses caused by noncompliance with applicable legal standards.

698 A.2d 959, 970 (Del. Ch. 1996).

{62}    The Amended Complaint does not allege any specific knowledge of wrongdoing by the directors; nor does it call into question the company's corporate information and reporting system. Plaintiffs merely put forth conclusory allegations that defendants participated in, approved, or benefited from the alleged wrongdoing. As such allegations have been roundly rejected by Delaware courts, this Court cannot find demand excusal on that basis.

{63}    Fourth, plaintiffs raise the bootstrap argument that in order to bring suit defendants would be forced to sue themselves. Such an argument, if accepted, would utterly obliterate the demand requirement. Perhaps no allegation of directorial interest has been more often asserted or more consistently rejected in the courts of Delaware. *See Aronson*, 473 A.2d at 818 (stating that "a bare claim of this sort raises no legally cognizable issue under Delaware corporate law"); *Brehm*, 746 A.2d at 257, n. 34; *Pogostin*, 480 A.2d at 625. This Court rejects the argument as well.

{64}    Fifth, plaintiffs argue that demand here would have been futile because, if the directors were to bring suit against themselves, they would open themselves up to liability in other related litigation. Specifically, plaintiffs argue that prosecuting suit on behalf of the company against themselves would open the directors up to future civil litigation for securities laws violations and would harm them in the class actions currently pending in federal district court. (Consol. S'holder Compl. ¶¶ 157(n) & (p).) Again, these assertions are merely conclusory and have similarly been rejected by Delaware courts. *See, e.g., Decker*, 1989 Del. Ch. LEXIS 143, at *8 (holding that "the suggestion that demand is excused because the directors . . . are defending related litigation is without merit."); *see also Allison v. Gen. Motors Corp.*, 604 F. Supp. 1106, 1113 (D. Del. 1985).

{65}    Sixth, plaintiffs assert that the directors are interested because the company's liability insurance does not cover suits brought directly by the company against the directors. Plaintiffs argue that the director defendants have a vested interest in ensuring that the lawsuit is derivative, rather than direct, in nature because derivative actions, unlike direct actions, are covered under the policy. (Consol. S'holder Derivative Compl. ¶ 157(q).)

{66}    This argument has commonly been made in Delaware courts, but to no avail. For instance, the Delaware Chancery Court in *Decker v. Clausen* found such an argument to be nothing more than a variation on the "'directors suing themselves' and 'participated in the wrongs' refrain." *Decker*, 1989 Del. Ch. LEXIS 143, at *8; *see also Caruana v. Saligman*, 1990 WL 212304, at *4 (Del. Ch. Dec. 21, 1990) (noting that such allegations have been "found to provide no particularized facts creating a reasonable doubt that the directors are disinterested or independent"). Like the arguments discussed above, accepting this bootstrap rationale for demand futility would fly in the face of established Delaware case law.

{67}    In addition to showing a financial interest, a plaintiff may establish reasonable doubt as to a

director's disinterest on an entrenchment theory. Under Delaware law, "[w]here . . . allegations detail the manipulation of corporate machinery by directors for the sole or primary purpose of perpetuating themselves in office, the test of *Aronson* is met and demand is excused." *Pogostin*, 480 A.2d at 627. However, "speculation on motives for undertaking corporate action are wholly insufficient to establish a case of demand excusal." *Grobow*, 539 A.2d at 188.

{68}     Plaintiffs allege that the director defendants have been granted stock options, some of which are unvested and which therefore create a financial incentive for the director defendants to retain their positions as directors. (Consol. S'holder Derivative Compl. ¶ 157(g).) The mere fact that directors receive customary compensation such as stock options has been rejected as grounds for demand excusal in Delaware courts. *See Grobow*, 539 A.2d at 188. Delaware courts have accepted such an argument, however, where the plaintiffs pled particularized facts sufficient to indicate that the outside directors were granted options that were of such colossal proportion that those directors "could not objectively decide whether to commence legal proceedings against fellow directors who are directly responsible for the outside directors' continuing positions on the board." *In re eBay, Inc. S'holders' Litig.*, 2004 Del. Ch. LEXIS 4, at *9 (Del. Ch. February 11, 2004). Plaintiffs have not so pled here.

{69}     Plaintiffs contend that it is "reasonable to assume that an individual who has already received, and who expects to receive still more options of such significant value could not objectively decide whether to commence legal proceedings against other directors." (Consol. S'holder Derivative Compl. ¶ 157(g).) This cursory proposition that it is "reasonable to assume" that the Pozen directors would be motivated to reject any demand because they would like to keep their jobs is a far cry from the particularized pleading required for demand excusal. Plaintiffs have not provided any factual support for this contention, nor have they provided any indication that the directors' jobs have in any way been threatened. These allegations are patently insufficient and fail to establish a reasonable doubt of the directors' disinterest. To hold that a director is interested because he or she has long term stock options would defeat one of the primary goals of good governance and that is to align the directors' interest with the long term interests of the shareholders. Plaintiffs' position, if adopted, would have the consequence of eliminating long term incentives for directors. Consequently, plaintiffs have failed to establish a reasonable doubt as to any of the outside directors' disinterestedness.

2.

DIRECTOR INDEPENDENCE

{70}     Having found that, for the purposes of this opinion, only one of the directors, Defendant Plachetka, is so interested that he could not adequately consider demand, the Court now turns to the independence of Pozen's other seven directors. A director is independent where his "decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816. Under Delaware law, to demonstrate that a director lacks the independence necessary to adequately consider demand, a plaintiff must "allege with particularity that the . . . directors were dominated or otherwise controlled by an individual or entity interested in the transaction." *Grobow v. Perot*, 539 A.2d 180, 189 (Del. 1988).

{71}     As discussed above, the Court has concluded that plaintiffs have failed to demonstrate that a majority of Pozen's directors was sufficiently interested to excuse demand. For purposes of this opinion, only the lone insider director, Mr. Plachetka, is considered interested. Plaintiffs have not sufficiently alleged that the other seven director defendants were dominated or controlled such that they could not

have adequately considered a demand at the time the complaint was filed.

{72} Plaintiffs attempt to impeach the director defendants' independence on the following grounds:

1. Defendants Tomason, Rizzo, and Rejeange are beholden to Defendants Wood, Wise, Lee, and Butler, who, in their capacity as members of the Board's Compensation Committee, are authorized to make decisions with regard to stock options, salary, and other methods of compensation. (Consol. S'holder Derivative Compl. ¶¶ 157(b), (c) & (i)) and

2. Defendants Plachetka, Wise, Butler, Lee, and Barnhardt's independence is eroded by certain long-standing business and personal relationships which cause them to have divided loyalties (Consol. S'holder Derivative Compl. ¶ 157(h)).

These arguments are considered in turn.

{73} Plaintiffs first question the independence of four of Pozen's directors on the ground that they are beholden to the Board's Compensation Committee. Plaintiffs likewise question the independence of Defendants Plachetka, Tomason, Rizzo, and Rejeange because the Compensation Committee has the power to grant, terminate, and make other decisions with regard to stock options and other awards under Pozen's 1996 Stock Option Plan, 2000 Equity Compensation Plan, and 2001 Long Term Incentive Plan. (Consol. S'holder Derivative Compl. ¶ 157(b).)

{74} The Delaware Supreme Court set forth the standard for evaluating a compensated director's independence in *Telxon Corp. v. Meyerson*:

> A director may . . . be deemed "controlled" if he or she is beholden to the allegedly controlling entity, as when the entity has the direct or indirect unilateral power to decide whether the director continues to receive a benefit upon which the director *is so dependent or is of such subjective material importance that its threatened loss might create a reason to question whether the director is able to consider the corporate merits of the challenged transaction objectively*.

802 A.2d 257, 264 (Del. 2003) (emphasis added).

{75} Plaintiffs have failed to plead particularized facts sufficient to satisfy this standard as to any of the director defendants. Plaintiffs have merely alleged that members of the Compensation Committee have the power to decide whether certain directors continue to be compensated and that as a consequence the other directors would be motivated to act in compliance with their desires. Plaintiffs have not alleged any facts, however, which would indicate that these awards are of such "subjective material importance" that they bring into question any of the defendants' directorial independence.

{76} Accepting such an argument, without any allegations of materiality, would operate to excuse demand in virtually any case where directors receive compensation for their services—a result which Delaware courts have consistently declined to reach. *See, e.g., White v. Panic*, 793 A.2d 356, 366 (Del. Ch. 2000); *Grabow*, 539 A.2d at 188. The blanket assertion that Plachetka and the other directors are so interested in maintaining their compensation packages that they are beholden to the members of the Compensation Committee is too conclusory to establish that demand would have been futile here under the *Telxon* standard.

{77} Next, plaintiffs attack the Board's independence by pointing to business, professional, and personal relationships which plaintiffs claim have clouded the directors' ability to objectively consider demand. The Delaware Supreme Court has stated that "[a]llegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence." *Beam v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004); *accord Orman*, 794 A.2d at 27 ("The

naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence. The law in Delaware is well-settled on this point."). In order to overcome the presumption of independence a plaintiff must "plead facts that would support the inference that . . . the non-interested director would be more willing to risk his or her reputation" than to jeopardize his relationship with the person with whom he is allegedly entangled. *Beam*, 845 A.2d at 1052.

{78}     Plaintiffs have sought to identify three contexts in which such relationships arose here. First, Defendants Plachetka, Wise, and Butler were all at one time employed as executives at Glaxo, Inc. (Consol. S'holder Derivative Compl. ¶ 157(h)(i).) It is unclear from the Amended Complaint, however, whether they were ever there at the same time or ever worked together. Second, Defendant Lee and a Pozen executive both held positions at Ernst & Young, LLP for some unspecified period of time prior to March 1997. (Consol. S'holder Derivative Compl. ¶ 157(h)(ii).) It is unclear from the Amended Complaint, however, whether the two were ever there at the same time, worked at the same location, or ever worked together. Third, Defendant Lee is employed as a managing partner of a venture capital fund which is one of Pozen's investors. (Consol. S'holder Derivative Compl. ¶ 157(h)(iii).) Mr. Lee's affiliation with a shareholder, however, is far more compatible with independence than a lack thereof.

{79}     The allegations here fall woefully short of pleading the type of relationships that would sufficiently call into question any of these directors' independence under Delaware law. Plaintiffs' bare allegations of past and current business relationships fall far short of the heightened pleading required by *Beam v. Stewart*. Plaintiffs do not plead any facts with particularity that would indicate how any of these relationships would interfere with any director's ability to properly consider a demand; nor do they provide any indication that any one of these directors would be more willing to risk his professional reputation than to jeopardize the relationship described. Plaintiffs' cursory allegations of business and personal relationships are therefore insufficient to excuse demand.

{80}     Plaintiffs have failed to plead particularized facts sufficient to raise a reasonable doubt as to whether a majority of Pozen's Board of Directors could have exercised its independent and disinterested business judgment in responding to demand. Therefore, plaintiffs' failure to make demand on Pozen's Board is not excused.

{81}     For the foregoing reasons, defendants' motion to dismiss is granted.[3]

IV.

CONCLUSION

{82}     Based upon the foregoing, it is hereby ORDERED, ADJUDGED and DECREED that defendants' motion to dismiss plaintiffs' claims is granted and plaintiffs' claims are dismissed with prejudice.[4]

IT IS SO ORDERED, this the _____ day of _____, 2005.

---

[1]          Even on the merits, plaintiffs' insider trading claims are tenuous at best. Under Delaware law, in order for a plaintiff to recover on an insider trading claim "it must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information." *Stepak v. Ross*, 1985 WL 21137, at *5 (Del. Ch. Sept. 5, 1985).
          Plaintiffs have failed to plead facts sufficient to satisfy this standard. The Amended Complaint does not set forth a single

particularized allegation explaining what inside knowledge Plachetka traded on and how he came across such information. Plaintiffs simply plead that, because of Plachetka's position as President, CEO, and director; access to corporate documents; and meetings and conversations with other insiders, he "knew of adverse non-public information." (Consol. S'holder Derivative Compl. ¶ 17.) The Amended Complaint cites only one date on which Plachetka sold shares of Pozen stock and fails to tie that event to any specific knowledge on the part of Plachetka. (Consol. S'holder Derivative Compl. ¶¶ 105, 153.)

Further, there are insufficient facts to allow a reasonable inference as to what the purpose of the sale was or whether it was made on the basis of any non-public information. While plaintiffs tout the size of the sale, they fail to provide any indication as to what the percentage of Plachetka's total ownership of Pozen stock the sale comprised. Plaintiffs merely plead that Plachetka made a single sale of Pozen stock during the relevant period and assert a conclusory allegation that the sale was based on some information to which he would have had access given his status in the company. The allegations of insider trading levied against three other members of Pozen management, which mirror those brought against Plachetka, are equally suspect and likewise fall far short of the type of pleading necessary to mount such a claim.

[2] That complaint is the essence of the class action pending in federal court.

[3] In light of the Court's ruling on the demand requirement, it is unnecessary to reach defendants' arguments as to the adequacy of plaintiffs' claims. Even if demand were excused, however, it is unlikely that any of plaintiffs' claims would survive a motion to dismiss under Rule 12(b)(6). Plaintiffs' claims of insider trading are suspect in that they fail to plead the amount of shares sold in each transaction relative to the total holdings of the alleged insider trading defendant. Moreover, in no case do plaintiffs tie any of the individual trades to any specific knowledge on the part of the individual seller. *See Stepak v. Ross*, 1985 WL 21137, at *5 (Del. Ch. Sept. 5, 1985) (stating that for a plaintiff to recover on an insider trading claim "it must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information").

Plaintiffs' fiduciary duty, abuse of control, and gross mismanagement claims would also likely fail because they fall short of the strict pleading requirements necessary to overcome the presumptions of the business judgment rule. Plaintiffs' waste of corporate assets claim would also likely be dismissed for failure to plead "an exchange so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *White v. Panic*, 783 A.2d 543, 554 (Del. 2001). Plaintiffs' unjust enrichment claims would also likely fail because the complaint does not allege (1) that amounts were paid to the defendants without justification or (2) the absence of a remedy at law, both of which are required by Delaware law. *See Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 585 (Del. Ch. 1988).

[4] Plaintiffs have asked the Court for leave to amend the complaint. However, it is well-settled under Delaware law that, as a general rule, a plaintiff should not be afforded the opportunity to amend the complaint where he or she fails to properly plead demand futility. *See White*, 783, A.2d at 555 (noting that this rule is designed to encourage plaintiffs "to investigate their claims before filing a complaint so that they have a basis at the outset to make particularized factual allegations in the complaint"). The Delaware Supreme Court has crafted a "narrow exception" to this general rule "where the Court . . . announces a new rule of law or clarifies pleading standards that apply to the plaintiffs [sic] cause of action." *Id.* This Court does not seek to modify any aspect of Delaware law as it pertains to demand futility. Therefore, the Amended Complaint must be dismissed *with prejudice.*

The Court notes that it was within the plaintiffs' powers as Pozen shareholders to avail themselves of information that may have allowed them to plead facts with sufficient particularity to survive the defendants' motion. While not entitled to discovery in order to prove demand futility, had plaintiffs brought a motion under Section 220 of the Delaware General Corporation Law seeking inspection of Pozen's books and records, they may have discovered facts that would have allowed them to raise a reasonable doubt as to the directors' disinterest and independence. *See* Del. Code Ann. tit. 8, § 220 (2004). While stopping short of requiring plaintiffs to conduct an inspection of the corporation's books and records before commencing a derivative action, Delaware courts have offered strong words for plaintiffs who, after failing to do so and filing inadequate pleadings, cause "substantial cost to the parties and the judiciary." *Beam*. 845 A.2d at 1057. *See, e.g., White*, 783 A.2d at 549-50; *Rales*, 634 A.2d at 934 n. 10; *Beam v. Stewart*, 833 A.2d 961, 981 (Del. Ch. September 30, 2003) (noting that "it is troubling to this Court that, notwithstanding repeated suggestions, encouragement, and downright admonitions over the years both by this Court and by the Delaware Supreme Court, litigants continue to bring derivative complaints pleading demand futility on the basis of precious little investigation beyond perusal of the morning newspapers").