Egelhof v. Szulik, et al., 2006 NCBC 4.

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE

SUPERIOR COURT DIVISION
FILE NO. 04 CVS 11746

ANDREW EGELHOF, Derivatively on Behalf of
Red Hat, Inc.

Plaintiff,

vs.

MATTHEW J. SZULIK, KEVIN B. THOMPSON,
PAUL J. CORMIER, TIMOTHY J. BUCKLEY,
MARK H. WEBBINK, ALEX PINCHEV, ROBERT
F. YOUNG, EUGENE J. McDONALD, F. SELBY
WELLMAN, MARYE A. FOX, WILLIAM S.
KAISER, DR. STEVE ALBRECHT and H. HUGH
SHELTON

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER AND OPINION**

{1}     This case arises out of Plaintiff Andrew Egelhof's shareholder derivative claims brought on behalf of Red Hat, Inc. ("Red Hat", "The Company") against Defendants Matthew J. Szulik, Kevin B. Thompson, Paul J. Cormier, Timothy J. Buckley, Mark H. Webbink, Alex Pinchev, Robert F. Young, Eugene J. McDonald, F. Selby Wellman, Marye A. Fox, William S. Kaiser, Dr. W. Steve Albrecht, and Gen. H. Hugh Shelton, in their capacities as officers and/or members of Red Hat's Board of Directors. Specifically, Plaintiff asserts claims for insider selling and misappropriation of information, breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment. Red Hat is named as a nominal defendant. This matter comes before the Court on Defendants' motion to dismiss.

{2}     After considering briefs and oral arguments, the Court GRANTS Defendants' motion to dismiss on the grounds that the Amended Complaint does not establish demand futility under Delaware law and because Mr. Egelhof is no longer a shareholder and thus lacks standing to pursue this action.

*Garlitz & Williamson, PLLC by F. Lane Williamson ; Robbins Umeda & Fink, LLP by Brian J. Robbins, Jeffrey P. Fink, and Steven R. Wedeking for Plaintiff Andrew Egelhof.*

*Womble Carlyle Sandridge & Rice, PLLC by Pressly M. Millen and Christopher W. Jones; Wilmer Cutler Pickering Hale & Dorr, LLP by Jeffrey B. Rudman, William H. Paine, Christopher Davies, and Coale P. Anderson for Defendants Matthew J. Szulik, Kevin B.*

*Thompson, Paul J. Cormier, Timothy J. Buckley, Mark H. Webbink, Alex Pinchev, Robert F. Young, Eugene J. McDonald, F. Selby Wellman, Marye A. Fox, William S. Kaiser, Dr. W. Steve Albrecht, and H. Hugh Shelton.*

I.

PROCEDURAL BACKGROUND

{3}	This shareholder derivative action was filed in Wake County Superior Court on August 18, 2004. The case was designated complex business and assigned to the undersigned Special Superior Court Judge for Complex Business Cases by order of the Chief Justice of the Supreme Court of North Carolina dated December 29, 2004. Plaintiff's Amended Shareholder Derivative Complaint ("Amended Complaint") was filed on July 21, 2005.

{4}	Defendants filed a motion to dismiss on September 9, 2005, asserting that Plaintiff's claims should be dismissed for failure to make demand on the corporation prior to filing suit. The Court heard oral arguments on the motion on February 2, 2006.

{5}	Several related class actions have been filed in the Eastern District of North Carolina against Red Hat, Inc. and Matthew J. Szulik, et al., alleging violations of the Securities Exchange Act of 1934. Those actions remain pending.

II.

FACTUAL BACKGROUND

A.

THE PARTIES

{6}	Plaintiff Andrew Egelhof was at one time a common stock shareholder of Red Hat. At oral argument Plaintiff's counsel did not know how many shares Egelhof owned; nor did he have any other knowledge about Plaintiff, whose only contact appears to have been with the "shareholder relations" department of Robbins, Umeda & Fink. Subsequent to the hearing, plaintiff's counsel contacted the Court to give notice that, sometime in the previous year, Mr. Egelhof had in fact sold his shares of stock.

{7}	Nominal Defendant Red Hat is a corporation organized and existing under the laws of the state of Delaware, with its headquarters located in Raleigh, Wake County, North Carolina. Red Hat, one of the world's leading open source and Linux providers, provides operating system platforms along with middleware, applications, and management solutions, as well as support, training, and consulting services to large global enterprises.

{8}	Defendant Matthew J. Szulik ("Szulik") is, and at all relevant times has been, President and Chief Executive Officer of Red Hat and Chairman of the Company's Board of Directors.

{9}	Defendant Kevin B. Thompson ("Thompson") was Executive Vice President, Chief Financial Officer ("CFO"), and Treasurer of Red Hat until he resigned on June 14, 2004.

{10}	Defendant Paul J. Cormier ("Cormier") is, and at all relevant times has been, Executive Vice President of Engineering at Red Hat.

{11}	Defendant Timothy J. Buckley ("Buckley") was, at all relevant times hereto, the Executive Vice President and Chief Operating Officer ("COO") of Red Hat until 2004.

{12}	Defendant Mark H. Webbink ("Webbink") is, and at all relevant times has been, the Senior Vice President, Secretary, and General Counsel of Red Hat.

{13}    Defendant Alex Pinchev ("Pinchev") is, and at all relevant times since April 2003 has been, the Executive Vice President of Worldwide Sales and has been the President of International Operations of Red Hat.

{14}    Defendant Robert F. Young ("Young") is, and at all relevant times has been, a member of the Board of Directors of Red Hat.

{15}    Defendant Eugene J. McDonald ("McDonald") is, and at all relevant times has been, a member of the Board of Directors of Red Hat.

{16}    Defendant F. Selby Wellman ("Wellman") is, and at all relevant times has been, a member of the Board of Directors of Red Hat.

{17}    Defendant Marye Anne Fox ("Fox") is, and at all relevant times since December 2002 has been, a member of the Board of Directors of Red Hat.

{18}    Defendant William S. Kaiser ("Kaiser") is, and at all relevant times since July 2003 has been, a member of the Board of Directors of Red Hat.

{19}    Defendant Dr. W. Steve Albrecht ("Albrecht") is, and at all relevant times has been, a member of the Board of Directors of Red Hat.

{20}    Defendant Gen. Henry H. "Hugh" Shelton ("Gen. Shelton") is, and at all relevant times has been, a member of the Board of Directors of Red Hat.

{21}    At the time the original complaint was filed, the Red Hat Board of Directors thus consisted of one insider—Szulik—and seven outside directors—Young, McDonald, Wellman, Fox, Kaiser, Albrecht, and Gen. Shelton.

B.
OVERVIEW OF THE FACTS

{22}    Plaintiff alleges the following facts, which, for the purposes of this motion to dismiss, will be treated as true.  Plaintiff's claims center around Red Hat's decision in July 2004 to modify its long-standing method of reporting revenue generated by software subscription agreements.

{23}    Red Hat, which was formed in 1993, is a software company that is headquartered in Raleigh, North Carolina.  Red Hat went public in 1999 and has thirty-one offices and over 1,000 employees worldwide.  It creates and markets open source[1] and LINUX based solutions, including an operating system called Red Hat Linux, which is based on the open source operating system originally developed by Linus Torvalds, a Finnish student, in 1991.  The original version of Red Hat Linux was first sold in 1994. (Amended Compl. ¶ 55.)

{24}    Red Hat introduced the first enterprise-class operating system, originally named Red Hat Advanced Server, in March 2002.  Enterprise operating systems allow customers—generally businesses, academic institutions, and governmental entities—to operate multiple computer systems with different types of computers on a single network.  Red Hat Enterprise Linux, now in release in its fourth version, is sold through a subscription model, under which its software and services are sold to customers in the form of annual subscriptions on a per-computer basis. (Amended Compl. ¶ 57.)

{25}    On July 13, 2004, Red Hat announced a plan to modify its method of revenue recognition for those subscription agreements and to restate its financial statements over a two-year period to reflect that

change.  Red Hat, with the approval of its outside accountants, PriceWaterhouseCoopers ("PWC"), had previously reported revenue from its subscription agreements on a monthly basis.  In June 2004, the Company met with its new audit partner, who took over under the normal rotation of auditing partners at PWC.  The new auditing partner advised that the Company should begin recognizing revenue from its subscription agreements on a daily rather than a monthly basis.  Red Hat opted to follow the new auditing partner's advice and begin recognizing that revenue on a daily basis.[2]  Financial statements from the fiscal years ending February 28, 2002, February 28, 2003, and February 29, 2004, were restated to reflect the change.

{26}    The day Red Hat announced its plan to restate earnings, its stock dropped to as low as $15.59 per share and closed at $15.73 per share.  The stock eventually fell to as low as $14.77 per share.  As of the date of this opinion, however, Red Hat's stock had climbed to $27.46 per share.[3]

## C.
## IMPROPER REVENUE RECOGNITION

{27}    Plaintiff alleges that Red Hat misled investors and violated Generally Accepted Accounting Principles ("GAAP") and federal securities laws and regulations by reporting revenue from its subscription agreements on a monthly rather than a daily basis.  It alleges that the individual defendants disregarded their duty to maintain oversight over the Company's accounting practices by allowing it to do so. (Amended Compl. ¶¶ 58-59.)

{28}    Before the Company altered its accounting practices on July 13, 2004, whenever it signed a one-year subscription agreement with a customer, it would report 1/12 of the revenue for that contract in the month in which the agreement was made—regardless of which day of the month the contract was formed. For instance, if a customer purchased a one-year subscription to Linux Enterprise or signed a contract for services on August 28, instead of reporting four days of income for that month, Red Hat would record a full month of revenue, or 1/12 the total revenue associated with the contract.  (Amended Compl. ¶¶ 60-61.)  This specific example is particularly notable because, plaintiff argues, given that August is the final month of the Company's second fiscal quarter, the practice had the effect of exaggerating the earnings that Red Hat reported in its quarterly financial statements.  (Amended Compl. ¶ 61.)  The effect was not to report earnings that the company would never receive but to report earnings in the first month of a given contract that would not actually be received until later.  When earnings were restated, therefore, earnings for some quarters were restated slightly higher and some slightly lower.

{29}    All parties agree that GAAP rules specify that revenue must be recognized "ratably."   Plaintiff gives no indication, however, either in his Amended Complaint or in his brief filed in response to the defendants' motion, that GAAP rules ever define the term "ratably" to specifically require that revenue be reported daily rather than monthly.  Evidently the two different partners at PWC who advised Red Hat on the issue interpreted "ratably" differently under GAAP rules.

{30}    The Amended Complaint alleges that the defendants "knew or should have known" that the practice was improper and should have acted to prevent it.  Plaintiff complains that the problem could easily have been solved by merely having someone "push a button" causing the figures to be tallied on a

daily basis rather than a monthly basis. (Amended Compl. ¶ 64.) The Amended Complaint suggests, but does not state outright, that the practice was fueled by a desire by Red Hat's management and directors to manipulate sales figures to meet the Company's unreasonable financial objectives for each quarter by causing a large "spike" in business late in the last days of each month and quarter. Plaintiff contends that the individual defendants "could easily manipulate" the recognition of revenue in order to "hit particular revenue targets and enjoy bonuses and other incentive compensations that were approved by the Compensation Committee." (Amended Compl. ¶ 64.)

{31}     The effect of the earnings restatement was to shift some earnings from earlier months to later months. For each one-year subscription, a portion of what was reported for the first month was shifted to the twelfth month. The result was that some quarters were restated slightly higher than originally reported and some slightly lower. The total shift in revenue for the entire period was less than one-half of one percent (approx. .37%). *See* Red Hat 10Q for 1Q of FY 2005, at 21 (Defendants' Brief in Support of Motion to Dismiss ("Defendants' Brief"), Ex. B); Red Hat 8K for 2004, at Ex. 99.2 (filed June 17, 2004) (Defendants' Brief, Ex. C); Red Hat 10K/A for FYE Feb. 29, 2004, at 57, 70-71 (Defendants' Brief, Ex. D); Red Hat 10K for FYE Feb. 29, 2004, at 65-66 (Defendants' Brief, Ex. E); Red Hat 10K for FYE Feb. 28, 2003, at 15, 62-63 (Defendants' Brief, Ex. F).

{32}     Plaintiff claims that defendants misled investors by failing to adopt sufficient internal controls, which allowed the Company to improperly inflate the percentage of customers who were going to renew their subscriptions, in turn motivating it to manipulate its accounting practices in order to keep sales figures in line with those unreasonable forecasts of renewal rates. (Amended Compl. ¶¶ 66-76.) Defendant Thompson allegedly involved himself directly in the dissemination of false subscription information to investors and the public at large by threatening the jobs of any members of the sales staff who did not "produce rosy sales forecasts." (Amended Compl. ¶¶ 74-75.) Defendant Szulik is also alleged to have been involved in the subscription renewal process.

{33}     Red Hat's lack of internal controls also allegedly led to manipulation of the Company's quarterly earnings estimates with respect to consulting services offered to its customers. The Amended Complaint alleges that "a large quantity of revenues were being recognized in association with consulting hours that had not actually been worked," causing Red Hat to be "'stuck' with a 'bunch of work' for the consultants to do and no budget with which to compensate the consultants." (Amended Compl. ¶ 77-78.) The individual defendants are also alleged to have orchestrated an "atmosphere of fear and intimidation" which ultimately led to much of the activity about which plaintiff complains. (Amended Compl. ¶¶ 79-88.) However, no restatement of income by Red Hat was based upon charges for consulting services.

D.

INSIDER TRADING

{34}     Plaintiff's Amended Complaint alleges insider trading by several of Red Hat's officers and directors, only two of whom, Defendants Szulik and Kaiser, are members of the Board of Directors. Specifically, Defendants Szulik, Buckley, Thompson, Kaiser, Cormier, and Webbink are alleged to have sold shares of Red Hat stock while in possession of undisclosed material adverse information. (Amended Compl. ¶¶ 14-19, 24, 119.)

{35}     Plaintiff does not indicate what non-disclosed material information any of the defendants possessed at the time of any particular sale. Nowhere in the Amended Complaint does plaintiff allege the existence of any specific knowledge on the part of any of the insider trading defendants at the time of any

specific sale; nor does Plaintiff point to any specific sources of such information. The extent of plaintiff's allegations of insider trading is that five of Red Hat's officers and two directors owned and sold stock during a three-year period and that because of their positions in the company they must have known some adverse non-public information at some unstated time during the same period. (Amended Compl. ¶¶ 14-19, 24, 119.)

## E.
## THE MISSTATEMENTS

{36}     In addition to allegations of improper revenue recognition and insider trading, the Amended Complaint alleges a failure of the Board of Directors to properly supervise the conduct of and statements made by company officers during the period between December 17, 2002, and September 20, 2004. The Amended Complaint includes a 19-page long string of press releases, articles from *TheStreet.com*, and one SEC filing, all of which include allegedly improper statements made by Red Hat officers. The only defendants to whom any of the statements are directly attributed are Defendants Thompson and Szulik. (Amended Compl. ¶¶ 89-109.) None of the statements are attributed specifically to any of the outside directors.

{37}     Most of the press releases pasted into the Amended Complaint were issued by the Company prior to the restatement of earnings, and Plaintiff claims that they include false statements of exaggerated earnings and earnings estimates generated by Red Hat's faulty revenue reporting practices. A press release issued on July 13, 2004, was entitled "Red Hat Announces Plan to Change Method of Revenue Recognition for Subscription Agreements and to Restate Financial Statements to Reflect Change." In that press release, Red Hat explained the nature and background of its decision to modify its revenue reporting practices and informed the public of its plan to restate its financial statements for the fiscal years ending in 2002, 2003, and 2004 and for the fiscal quarter ending May 31, 2004. The press release stated that the Red Hat's independent auditors advised the Company that it should consider the change on June 16, 2004, and that the Company had decided to act on that suggestion. (Amended Compl. ¶ 104.)

{38}     On August 6, 2004, Red Hat filed a Form 10-K/A with the SEC restating its earnings for fiscal year 2002 through fiscal year 2004. The restatement sought to bring the Company's financial earnings for that time period in line with its recently adopted practice of recognizing income from subscription agreements on a daily basis. The filing stated that "[t]he effect of using the new method on our previously reported financial statements is to defer a portion of the revenue that had been previously recognized in the month of commencement of a subscription to the month in which the subscription ends." (Amended Compl. ¶ 108.)

{39}     On August 18, 2004, just 36 days after Red Hat announced its decision to restate earnings, plaintiff filed suit alleging that, in adopting and failing to timely correct the Company's prior reporting methods, the director and officer defendants named in this lawsuit disrupted corporate controls, caused inflation in the company's billing and consulting services, and breached their fiduciary duties owed to the corporation. At no time prior or subsequent to the filing of the Amended Complaint did Plaintiff conduct any inspection of the books and records of Red Hat or make any demand for any action or information from the Board or the Company.

## III.
## MOTION TO DISMISS

{40} This matter comes before the Court on the defendants' motion to dismiss. Defendants argue first that the Amended Complaint should be dismissed because Plaintiff has failed as a matter of law to adequately plead demand futility. Second, Defendants argue that Plaintiff has failed to state any claim which sufficiently alleges damages which are not premature, speculative, or defectively conclusory. Because Plaintiff has failed to make a demand on the Company before filing suit or to adequately plead demand futility, the Court does not need to reach the defendants' second argument.

{41} Defendants' motion to dismiss centers largely around Plaintiff's failure to make a demand on the corporation prior to bringing this derivative action. Because Red Hat is a Delaware corporation, this Court applies Delaware law in determining whether Plaintiff's failure to make demand should be excused. N.C. Gen. Stat. § 55-7-47 (2004); *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95-96 (1991). This Court recently applied Delaware law in the demand futility context in *In re Pozen S'holders Litig.*, 2005 NCBC 7 (N.C. Super. Ct. Nov. 10, 2005). The right of a Delaware corporation's shareholder to bring a derivative action does not come into existence until (1) he has made a demand on the corporation to institute the action itself, (2) his demand has been refused, or (3) he demonstrates that demand on the corporation would have been futile. *Stepak v. Dean*, 434 A.2d 388, 390 (Del. Ch. 1981).

{42} Plaintiff concedes that he did not make a demand on the corporation before filing suit. (Amended Compl. ¶ 123.) Therefore, he may only proceed if he can adequately demonstrate that demand would have been futile here.

B.

DEMAND FUTILITY

{43} "Pleadings in derivative suits . . . must comply with stringent requirements of factual particularity that differ substantially from . . . permissive notice pleading." *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000). Under Delaware law, in order for a derivative plaintiff to survive a motion to dismiss in a case where demand is not first made on the corporation, he must plead facts *with particularity* that demonstrate the reasons why demand would have been futile. *Aronson*, 473 A.2d 805, 8115 (Del. 1984); *Brehm*, 746 A.2d at 254. If that heavy burden is not satisfied, the complaint must be dismissed, regardless of the strength of his claim on the merits. *Brehm*, 746 A.2d at 249.

{44} As this Court discussed in its earlier decision in *Pozen*, Delaware courts have established two separate lines of inquiry in demand futility cases. *See Pozen*, 2005 NCBC 7, at ¶¶ 47-50. Where the complaint challenges a specific action of the board of directors, Delaware courts apply the two-prong test set forth by the Delaware Supreme Court in *Aronson v. Lewis*. *Aronson*, 473 A.2d at 811. Where no specific action of the board is challenged, however, Delaware courts apply the singular inquiry established in *Rales v. Blasband*. 634 A.2d 927 (Del. 1993). As defendants have argued and as plaintiff's counsel conceded at oral argument, plaintiff does not challenge any specific action of Red Hat's Board of Directors. Therefore, the Court applies the *Rales* test.

{45} Under the *Rales* analysis, the court asks "whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its *independent and disinterested business judgment* in responding to the demand." *Rales*, 634 A.2d at 934 (emphasis added). The focus of the *Rales* test is on "the disinterestedness and the independence of a majority of the board of directors in responding to a demand." *Rattner v. Bidzos*, 2003 WL 22284323, at *8 (Del. Ch. Oct. 7, 2003). Demand futility is analyzed with a reasonable doubt standard, but a derivative plaintiff must plead particularized facts to

support that reasonable doubt. *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996); *Grabow v. Perot*, 539 A.2d 180, 186-87 (Del. 1988).

{46}    Therefore, in analyzing plaintiff's demand futility allegation the Court asks whether plaintiff has pled particularized facts which raise a reasonable doubt that a majority of Red Hat's Board of Directors at the time the original complaint was filed would have been sufficiently disinterested and independent to adequately consider a demand had one been made. *See Pozen*, 2005 NCBC 7, at ¶ 51. For the purposes of this opinion only, the Court considers the only inside director, Defendant Szulik, to be interested. Plaintiff does not allege that any of the directors here lacked the independence to properly consider demand; plaintiff focuses instead on the directors' lack of disinterest. Therefore, to survive the motion to dismiss, the Amended Complaint must raise a reasonable doubt, based on particularized facts, as to the disinterest of at least three of the seven outside directors.

{47}    Under *Rales*, in order to properly allege that a director is "interested," a plaintiff must establish with particularized facts that (1) the director "will receive a personal financial benefit from a transaction that is not equally shared by the shareholders" or (2) the decision to bring suit would "have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Rales*, 634 A.2d at 936. Plaintiff seeks to establish directorial interest by launching a laundry list of arguments. Plaintiff challenges the disinterestedness of the members of Red Hat's Board of Directors on the following grounds[4]:

1.    Defendant Kaiser himself committed acts of illegal insider trading while in possession of material, non-public information (Amended Compl. ¶ 123(a));

2.    Five of the directors, Defendants Wellman, McDonald, Kaiser, Fox, and Albrecht, are members of the Audit Committee, which was responsible for exercising oversight over the company's independent auditors and reviewing the audited financial statements and other disclosures, and which also recommended that the Board include improper statements of Red Hat's earnings in statements to both the SEC and the Company's shareholders (Amended Compl. ¶ 123(d));

3.    All of the outside directors receive annual cash fees and annual grants of stock options for their services as members of the Board of Directors (Amended Compl. ¶ 123(f) & (k));

4.    Defendants Albrecht and McDonald possess specialized financial expertise, creating a heightened duty to insure the accuracy and fairness of the Company's financials (Amended Compl. ¶ 123(g) & (h));

5.    All of the board members approved, permitted, or participated in the wrongs complained of by failing to prevent and correct the improper financials (Amended Compl. ¶ 123(f), (l), (n), & (o)). Also, five of the directors, Defendants Wellman, Kaiser, McDonald, Albrecht, and Gen. Shelton, as members of the Compensation Committee, directly permitted or condoned the Company's unlawful practices by approving incentive compensation for the director defendants and unduly compensating its officers (Amended Compl. ¶ 123(e));

6.    In order to bring suit, the directors would be forced to sue themselves (Amended Compl. ¶ 123(m));

7.    Any suit brought by Red Hat's Board of Directors would expose those directors to liability elsewhere (Amended Compl. ¶ 123(p) & (r));

8.      Red Hat's directors have to date failed to bring the action themselves despite having knowledge of the claims raised by plaintiff (Amended Compl. ¶ 123(q) & (t));

9.      The Company's liability insurance policy does not cover suits brought by the Company against the directors directly. Therefore, if the directors were to authorize suit, they would open themselves up to uninsured liability (Amended Compl. ¶ 123(s)).

{48}    These arguments very closely resemble those made and rejected by this Court in *Pozen*. They are similarly rejected here.

{49}    **Insider Trading.** Plaintiff's argument that Defendant Kaiser is too interested to properly consider demand on the grounds that he participated in alleged insider trading during the relevant period fails for lack of particularized pleading. To establish demand futility on the personal culpability of one or more of a board's directors, a plaintiff must demonstrate through particularized pleading that the director or directors face a "substantial likelihood" of personal liability—not just a "mere threat" of liability. *Rales*, 634 A.2d at 936 (citing *Aronson*, 473 A.2d at 815). Under Delaware law, to make out a prima facie claim for insider trading, a plaintiff must allege "that each sale by each individual defendant was entered into and completed on the basis of and because of, adverse material non-public information." *Stepak v. Ross*, 1985 WL 21137, at *5 (Del. Ch. Sept. 5, 1985).

{50}    The Amended Complaint does not state what insider information Kaiser possessed at the time he sold Red Hat stock—only that because of his position in the Company, he was in a position to know insider information. Plaintiff does not tie either of Kaiser's two alleged trades to any specific knowledge on his part or even state that the transactions were based on or motivated in any way by such knowledge. Plaintiff merely alleges that Kaiser generally possessed material non-public information at the time of each sale. Moreover, plaintiff fails to give any indication of the size of the two sales relative to his total ownership of Red Hat stock. Plaintiff would ask this Court to adopt a rule that the act of selling company stock would render any director so interested that he or she could not adequately consider demand, regardless of the point in time at which the sale took place, no matter what the size of the sale, and without any question as to what specific knowledge the selling director may have had at the time of the sale. Plaintiff's insider trading claim does little more than suggest a "mere threat" of liability for Defendant Kaiser. It certainly doesn't rise to the level of a "substantial likelihood of liability" required by *Rales* and *Aronson*.

{51}    **Audit Committee**. Plaintiff alleges that five of the eight directors are rendered interested by their roles on the Board's Audit Committee. Plaintiff charges that they breached their fiduciary duties by failing to regulate the Company's internal controls with regard to its financials, recommending that the Company include improper audited consolidated financial statements in its filings with the SEC, and approving quarterly and interim earnings estimates that were published to the investment community.

{52}    A Board of Directors' duty with regard to a system of internal controls is to "exercise a good faith judgment that the corporation's information will come to its attention in a timely manner as a matter of ordinary operations." *In re Caremark Deriv. Litig.*, 698 A.2d 959, 970 (Del. Ch. 1996). In order to adequately plead demand futility on the ground that the directors failed to fulfill their fiduciary duties to regulate the company's system of internal controls, a plaintiff must allege particularized facts that point to "red flags" that should have alerted the board to any wrongdoing. *See In re Caremark*, 698 A.2d at 969-70; *Guttman v. Huang*, 823 A.2d 492, 507 (Del. Ch. 2003) (demand not excused where the complaint included no "well-pled factual allegations—as opposed to wholly conclusory statements—that the

[defendant] directors committed any culpable failure of oversight under the *Caremark* standard").

{53}    Plaintiff's argument boils down to an assertion that these directors are interested merely because of their status as members of the Board's Audit Committee. The Amended Complaint indicates that the Audit Committee relied on the Company's outside auditor's determination that income on the subscription agreement should be recorded on a monthly basis and that once the auditor suggested that it should change that practice it acted quickly to adopt that change and restated its earlier financial statements to reflect the change. Plaintiff does not point to any specific facts indicating the existence of "red flags" which would have suggested to the members of the committee that there were problems with Red Hat's financials prior to June 2004 or of any conscious decision not to take action despite any such red flags. Plaintiff merely argues that because members of the committee had general access to "internal corporate documents," were included in "conversations," and attended various "meetings," they "knew or should have known" that the Company's internal controls were a "complete mess." (Amended Compl. ¶ 10.)

{54}    As noted by this Court in *Pozen*, the effect of such a ruling would be to make it virtually impossible to find a disinterested board of directors anywhere because audit committee members would be considered interested simply on account of their membership on the committee—a conclusion entirely inconsistent with the requirement that companies select disinterested and independent directors to serve on the committee. *See Pozen*, 2005 NCBC 7, at ¶ 59. Were the Court to recognize demand futility on the grounds asserted by plaintiff, the demand requirement would be rendered void in all cases where a company opts to restate earnings. Such a ruling would be inconsistent with the public policy that corporations act diligently to correct reported earnings when mistakes or inconsistencies are discovered or where current accounting practices dictate a change in reporting practices. Plaintiff's conclusory demand futility arguments with respect to the five members of the Audit Committee are insufficient for the Court to find that his failure to make demand is excused.

{55}    **Director Compensation**. Plaintiff alleges that demand is excused here because all of Red Hat's outside directors received compensation for their services on the Board of Directors. Plaintiff argues that in approving director compensation in the form of annual fees and stock options at the time of the alleged wrongdoing, defendants engaged in self-dealing which disqualifies them from properly considering any demand. The Supreme Court of Delaware has held that a director's disinterest is not impeached by the mere fact that he received compensation for his services. *Grobow v. Perot*, 539 A.2d 180, 188 (Del. 1988). Other courts applying Delaware law have reached the same conclusion. *See, e.g. In re E. F. Hutton Banking Practices Litig.*, 634 F. Supp. 265, 271 (S.D.N.Y. 1986) (apply Delaware law) (stating that "[s]uch a rule would eviscerate the rationale for *ever* making a demand and would strip [the demand requirement] of all meaning"). The mere adoption and approval of annual fees and moderate increases or stock option grants for directors is not enough to cast a reasonable doubt on a defendant directors' disinterest.

{56}    **Specialized Expertise**. Plaintiff alleges that because Defendants Albrecht and McDonald possess unique financial expertise, they owe a heightened duty to safeguard the Company's financials. Plaintiff essentially takes the position that merely because Red Hat sought and obtained the services of two professionals whom plaintiff claims are experts in their field, those two professionals are then incapable of objectively considering demand as a matter of law when the wrongful conduct alleged involves a matter within that area of expertise. Plaintiff's conclusory allegation is insufficient to excuse failure to make pre-suit demand.

{57}     **Approval of or Participation in the Wrongs Alleged**.  Plaintiff also contends that the Board of Directors as a whole lacks disinterest because it approved, permitted, or participated in the wrongs alleged.  As this Court recognized in *Pozen*, Delaware courts have consistently rejected demand futility arguments based on blanket allegations that the directors participated in or approved the alleged misconduct.  *Pozen*, 2005 NCBC 7, at ¶ 60.  *See, e.g., Aronson*, 473 A.2d at 817 (stating that "mere directorial approval of a transaction, absent particularized facts . . . establishing the lack of independence or disinterestedness of a majority of the directors, is insufficient to excuse demand"); *Rales*, 634 A.2d at 936; *Kaufman v. Belmont*, 479 A.2d 282, 288 (Del. Ch. 1984);  *Haber v. Bell*, 465 A.2d 353, 359 (Del. Ch. 1983); *Decker v. Clausen*, 1989 Del. Ch. LEXIS 143, at *7-8 (Del. Ch. Sept. 8, 1989).

{58}     Plaintiff asserts a blanket *Caremark* claim that the director defendants "knew or should have known" of the wrongful conduct alleged and that they breached their fiduciary duties by failing to have internal controls in place that would have worked to prevent or correct that misconduct.  Plaintiff has failed, however, to point to any specific facts that brought or should have brought any wrongdoing to the directors' attention—the "red flags" required by *Caremark*.  *See supra*, at ¶ 52.  Plaintiff also fails to plead facts that would call into question the good faith efforts of the directors to have systems in place that would prevent or correct such wrongdoing.  The Board's action in promptly responding to a suggestion from its ouside auditors demonstrates good faith—not bad faith or callous indifference.

{59}     Plaintiff attempts to bolster his argument by asserting that the five members of the Compensation Committee are interested because they "directly contributed to the unlawful practices herein" by approving incentive compensation packages for Red Hat's officers.  This assertion, though more specific, is also unsupported by particularized facts that would tie the incentive-based compensation plan to the wrongs alleged or that would show that any "red flags" existed which would alert the Board to any such connection.  Given that plaintiff relies on mere conclusions, this Court rejects this argument as it did in *Pozen*.

{60}     **Directors Forced to Sue Themselves**.  Plaintiff argues that demand would be futile simply because the directors would be required to sue themselves in order to properly bring suit.  As this Court recognized in *Pozen*, Delaware courts have consistently rejected this argument, which "raises no legally cognizable issue under Delaware corporate law."  *Pozen*, 2005 NCBC 7, at ¶ 63 (quoting *Aronson*, 473, A.2d at 818).

{61}     **Potential Liability in other Litigation**.  Plaintiff also bases his demand futility argument on the assertion that the defendants would likely open themselves up to liability in other potential litigation.  This argument was also made and rejected in *Pozen*, as has it been rejected by the courts of Delaware.  *Pozen*, 2005 NCBC 7, at ¶ 64; *see Decker*, 1989 Del. Ch. LEXIS 143, at *8.

{62}     **The Board's Failure to Bring Direct Action**.  The Court also rejects plaintiff's argument that demand is futile because the directors failed to bring a direct action themselves prior to the filing of the complaint.  The bare allegation that a board of directors failed to take action before suit was filed is not sufficient to establish demand futility.  *See Richardson v. Graves*, 1983 Del. Ch. LEXIS 466, at *8-9 (Del. Ch. June 17, 1983) ("The mere fact that [the board has] not elected to sue before the derivative action was filed should not of itself indicate 'interestedness.'  As a matter of fact, it is the Board's inaction in most every case which is the *reason d'etre* for Rule 23.1.").

{63}     **Liability Insurance**.  Finally, plaintiff alleges that demand would have been futile since the defendants would not have opted to bring suit themselves because the Company's liability insurance

would not cover a suit brought by the Company directly. This argument was also asserted and rejected by this Court in *Pozen*. 2005 NCBC 7, at ¶¶ 65-66. *See Decker*, 1989 Del. Ch. LEXIS 143, at *8; *Caruana v. Saligman*, 1990 WL 212304, at *4 (Del. Ch. Dec. 21, 1990).

{64} Overall, plaintiff asserts a myriad of arguments commonly made in demand futility cases and devoid of the type of particularized facts required by Delaware law to establish demand futility. Consequently, each of these arguments is rejected, and plaintiff's claims should be dismissed for failure to make demand on the corporation prior to bringing suit.

C.

BOOKS & RECORDS

{65} The Amended Complaint filed in this action is 84 pages long and has 151 numbered paragraphs. Notwithstanding the considerable length of the document, it nonetheless fails to plead sufficient facts to enable the Court to conclude that the plaintiff may proceed with his claims despite his failure to make a demand on the corporation prior to filing suit. As this Court noted in footnote 4 of its earlier opinion in *Pozen*, Plaintiff is possessed of the right under Delaware law and as a shareholder of Red Hat to conduct an inspection of the Company's books and records. Plaintiff opted not to avail himself of that right, despite the fact that in doing so he may have discovered facts on which to establish a proper basis for pleading demand futility.

{66} As noted in *Pozen*, "Delaware courts have offered strong words for plaintiffs who, after failing to [conduct an inspection of the corporation's books and records] and filing inadequate pleadings, cause 'substantial cost to the parties and the judiciary.'" *Pozen*, 2005 NCBC 7, at ¶ 82 n. 4 (quoting *Beam v. Stewart*, 845 A.2d 1040, 1057 (Del. 2004)). This Court echoes the concerns of Chancellor Chandler in *Beam v. Stewart*:

> It is troubling to this Court that, notwithstanding repeated suggestions, encouragement, and downright admonitions over the years both by this Court and by the Delaware Supreme Court, litigants continue to bring derivative complaints pleading demand futility on the basis of precious little investigation beyond perusal of the morning newspapers. This failure properly to investigate whether a majority of directors fairly can evaluate demand may lead to either (or both) of two equally appalling results. If there is no reasonable doubt that the board could respond to demand in the proper fashion, failure to make demand and filing the derivative action results in a waste of the resources of the litigants, including the corporation in question, as well as those of this Court. If the facts to support reasonable doubt could have been ascertained through more careful pre-litigation investigation, the failure to discover and plead those facts still results in a waste of resources of the litigants and the Court and, in addition, ties the hands of this Court to protect the interests of shareholders where the board is unable or unwilling to do so. This results in the dismissal of what otherwise may have been meritorious claims, fails to provide relief to the company's shareholders, and further erodes public confidence in the legal protections afforded to investors.

833 A.2d 961, 981-82 (Del. Ch. Sept. 30, 2003).

{67} For the foregoing reasons, defendants' motion to dismiss is granted.

IV.

CONCLUSION

{68} Based upon the foregoing, it is hereby ORDERED, ADJUDGED and DECREED that defendants' motion to dismiss plaintiff's claims is granted and plaintiffs' claims are dismissed with prejudice.[5]

IT IS SO ORDERED, this the 13th day of March 2006.

---

[1] Open source software is constructed using code that is free and available to the public at large to use and make improvements.

[2] *See infra* ¶ 28.

[3] The dramatic recovery in stock price may explain Mr.Egelhof's stock sale.

[4] One of Plaintiff's stated grounds for demand excusal is the fact that the Company issued an interest-free loan to Defendant Thompson in 2003, which is forgiven ratably over four years—an arrangement that Thompson would not want to jeopardize by taking action against the other directors (Amended Compl. ¶ 123(j).)   As Defendant Thompson is not, nor has he ever been, a member of Red Hat's Board of Directors, that argument is of no consequence to the Court's demand futility analysis.

[5] *See Pozen*, 2005 NCBC 7, at ¶ 82, n. 4.